AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of  
*(Briefly describe the property to be searched or identify the person by name and address)*

Light Tan Vivo Phone  
Seized as FP&F No: 2025565300026203-0001  
("Target Device 4")

Case No. 25-mj-5529

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4, as incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, as incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens |

The application is based on these facts:  
See attached affidavit of Border Patrol Agent Jason Larson, incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jason Larson, U.S. Border Patrol Agent  
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Telephone___ *(specify reliable electronic means)*.

Date: 10/09/2025

*Judge's signature*

City and state: San Diego, CA

Hon. Steve B. Chu, U.S. Magistrate Judge  
*Printed name and title*

# ATTACHMENT A-4
## PROPERTY TO BE SEARCHED

The following property is to be searched:

Light Tan Vivo Phone
Seized as FP&F No: 2025565300026203-0001
("Target Device 4")

**Target Device 4** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1, A-2, A-3, and A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **September 9, 2025 through September 23, 2025**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage Device, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Jason Larson, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Dark Blue iPhone
> Seized as FP&F No: 2025565300026201-0002
> (**"Target Device 1"**)
>
> White iPhone
> Seized as FP&F No: 2025565300026202-0002
> (**"Target Device 2"**)
>
> White Vortex Phone
> Seized as FP&F No: 2025565300026202-0003
> (**"Target Device 3"**)
>
> Light Tan Vivo Phone
> Seized as FP&F No: 2025565300026203-0001
> (**"Target Device 4"**)

Collectively, the **Target Devices**, as further described in Attachment A-1, A-2, A-3, and A-4 and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Cesar Enrique GARCIA MARTINEZ and Joseen Aaron ARGUETA-SOLIS (Defendants) for Transportation of Illegal Aliens, namely Oliverio CATARINO-MORALES and Alex REYES-HERNANDEZ (material witnesses). The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

1

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2011 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 14 years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have

resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to

make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On September 23, 2025, a Border Patrol agent was performing his assigned duties in the Brown Field Border Patrol Station's Area of Responsibility. The agent was wearing his full rough duty Border Patrol uniforms with badges and insignia clearly visible and was riding in a marked United States Border Patrol vehicle with working lights and sirens. At approximately 12:42 p.m., dispatch notified agents of a digital intrusion device activation showing a blue four door sedan and an individual looking into the bushes.

12. The agent responded to the area and observed a blue Toyota Corolla matching the description traveling at a high rated speed. The agent began to follow the vehicle and requested records checks. Record checks revealed the vehicle was registered out of Moreno Valley, CA. The agent initiated a vehicle stop and the vehicle yielded. The agent approached the vehicle and as he began to question the driver, he heard movement coming from the trunk of the vehicle. The agent asked the driver if he could open the trunk and the driver consent. Upon opening the trunk, the agent observed two individuals laying down inside. The agent conducted an immigration inspection on the two individuals, both

5

of which stated they were citizens of Mexico without any immigration documents allowing them to enter or remain in the United States legally.

13. At approximately 1:15 p.m., the agent placed the two individuals, later identified as Oliverio CATARINO-MORALES and Alex REYES-HERNANDEZ, under arrest for being illegally present in the United States. The agent subsequently placed the driver, later identified as Cesar Enrique GARCIA-MARTINEZ, under arrest for 8 USC 1324 (transporting illegal aliens). This area is located approximately 1.5 miles west of the Tecate, California Port of Entry and approximately 1.4 miles north of the United States/Mexico International Border.

14. Meanwhile, another Border Patrol agent was performing his assigned duties on the Campo Border Patrol Station's Abatement Team. This agent was dressed in plain clothes with his agency badge and insignia clearly visible on his body armor, and was riding in an unmarked vehicle with fully functioning emergency lights and sirens. At approximately 1:05 PM, while stationary at the Campo library on State Route 94, this agent observed a maroon Nissan Sentra with one male driver who quickly avoided eye contact with the agent. The agent began to follow the vehicle and requested records checks. The vehicle checks revealed that the vehicle was registered out of San Bernardino, CA. The agent also observed the vehicle increase his speed 20 mph above the posted limit and swerve into the center line.

15. At approximately 1:21 p.m., a supervisory Border Patrol agent in a marked Border Patrol vehicle initiated a vehicle stop on the Nissan at the request of the pursuing agent. The vehicle yielded and the supervisory agent conducted an immigration inspection. The supervisory agent observed the driver's hands shake nervously and noticed the driver was avoiding eye contact. The supervisory agent asked if he could search the vehicle, and the driver gave consent. During the search, the supervisory agent observed a rental receipt from Express Motors out of Moreno Valley, CA, for a 2003 blue Toyota Corolla. The supervisory agent received confirmation this documentation was for the same blue vehicle

from the aforementioned alien smuggling event. The supervisory agent then questioned the driver about the receipt and the driver stated, "I messed up" and that he was in the area to pick up illegal aliens. At approximately 2:29 PM, the supervisory agent placed the driver, later identified as Joseen Aaron ARGUETA-SOLIS, under arrest for conspiracy to transport illegal aliens. This area is located approximately 14 miles east of the Tecate, California Port of Entry and approximately 11 miles north of the United States/Mexico International Border.

16. At approximately 5:17 p.m., GARCIA-MARTINEZ was advised of his *Miranda* rights. GARCIA-MARTINEZ stated he understood his rights and was willing to answer questions without an attorney present. GARCIA-MARTINEZ stated he is a citizen of Honduras and that he was in the area because he saw a TikTok story depicting individuals running into vehicles. He subsequently reached out to the TikTok account and was instructed to communicate via WhatsApp, which he did. GARCIA-MARTINEZ stated he was going to be paid $1,800 per person he successfully transported. GARICA-MARTINEZ stated that he and ARGUETA-SOLIS traveled from San Bernadino to San Diego separately the night prior. He further stated that they were instructed earlier that morning to pick up two people off State Route 94. When GARCIA-MARTINEZ arrived at the designated location, he yelled "Charly" as instructed and released the lever for the trunk. Two individuals ran and got into the trunk, and GARCIA-MARTINEZ drove away, only making it approximately one-quarter mile before a Border Patrol Agent pulled him over.

17. At approximately 6:46 p.m., ARGUETA-SOLIS was advised of his *Miranda* rights. ARGUETA-SOLIS stated he understood his rights and was willing to answer questions without an attorney present. ARGUETA-SOLIS stated he is a citizen of Honduras. ARGUETA-SOLIS stated that he drove in front of GARCIA-MARTINEZ and acted as a look-out. He stated that he observed GARCIA-MARTINEZ pull over on the side of the road and two individuals entered the trunk of the vehicle. ARGUETA-SOLIS

7

further stated that when he saw Border Patrol agents pull behind GARCIA-MARTINEZ, he notified GARCIA-MARTINEZ and the smuggling coordinators via WhatsApp. ARGUETA-SOLIS stated all communications regarding the smuggling event were via WhatsApp.

18. At the time of arrest, **Target Device 1** was found on GARCIA-MARTINEZ' person. GARCIA-MARTINEZ gave verbal consent to search **Target Device 1. Target Devices 2 and 3** were found on the front passenger seat of ARGUETA-SOLIS' vehicle; he subsequently claimed both devices as belonging to him. ARGUETA-SOLIS gave verbal consent to search **Target Devices 2 and 3. Target Device 4** was found on CATARINO-MORALES' person. The **Target Devices** were subsequently seized.

19. Based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the Target Devices. In light of the above facts and my experience and training, there is probable cause to believe that the defendants and material witnesses were using the Target Devices to communicate with each other and others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **September 9, 2025, through September 23, 2025.**

### METHODOLOGY

20. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the devices are subscribed, and the nature of the data stored on the devices. Cellular devices today can be

8

simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

22. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

23. Law enforcement has previously attempted to obtain the evidence sought by these warrants through verbal consent for Target Devices 1, 2 and 3, but was unable to complete consent downloads of the phones at the station.

## CONCLUSION

24. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Sections 1324.

25. Because the **Target Devices** were seized at the time of defendant and material witness' arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **September 9, 2025, through September 23, 2025.**

//
//
//
//
//
//
//
//
//
//
//
//

26.    Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachments A-1, A-2, A-3, and A-4 and to seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Jason Larson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this **9th** day of October 2025.

_____
HON. STEVE B. CHU
United States Magistrate Judge

11